## In re QUAKER CITY COLD STORAGE CO.
### No. 21935.

District Court, E. D. Pennsylvania.
Feb. 27, 1943.

See, also, D.C., 45 F.Supp. 570.

Schnader & Lewis, and Wexler & Weisman, all of Philadelphia, Pa., for trustees.

J. Wesley McWilliams, of Philadelphia, Pa., for debtor.

Townsend, Elliott & Munson, of Philadelphia, Pa. (J. B. Colahan, of Philadelphia, Pa., of counsel), for claimant.

KALODNER, District Judge.

This matter originally started as a suit in the Court of Common Pleas of Philadelphia County by the claimant, Jerpe Commission Co., Inc., of Omaha, Nebraska (hereinafter called Jerpe) as plaintiff, against Quaker City Cold Storage Company (hereinafter called Quaker City) as defendant.

Subsequently, Quaker City filed a petition for reorganization under Chapter X of the Bankruptcy Act, 11 U.S.C.A. § 501 et seq., and trustees were appointed for it.

The parties thereafter agreed to have the issue transferred to, and determined by, this Court in the reorganization proceedings.

The claimant, Jerpe, thereupon filed its proof of claim, to which the trustees of Quaker City filed objections, and the matter was referred to a special master who took testimony and rendered a report dismissing Jerpe's claim.

The matter is now before me on the exceptions to the special master's report.

The testimony taken by the master was virtually altogether documentary and was not contradicted.

Rule 53(e)(2) of the Federal Rules of Civil Procedure, 28 U.S.C.A. following section 723c, provides: " * * * The court after hearing may adopt the report or may modify it or may reject it in whole or in part * * *."

Additionally: "The District Judge has the ultimate responsibility of determining the facts, and the say-so of a master cannot dispense with it." In re Michel, 2 Cir., 56 F.2d 15.

Accordingly, upon consideration of the entire record in the case and after hearing argument of counsel I make the following

### Findings of Fact.

1. On February 19, 1940, Quaker City entered into an arrangement with Bennett & Layton, Inc., San Francisco, California, poultry dealers, whereby it was agreed that Quaker City would make advances upon cars of turkeys shipped by Bennett & Layton to Quaker City to be stored for later sale, such advances not to be made until after the arrival of the shipment and its inspection by Quaker City.

2. During the month of May, 1940, Bennett & Layton requested Quaker City to transfer to Jerpe two cars of turkeys stored with Quaker City, upon which Quaker City had made advances amounting to $12,635, Jerpe to repay all advances, in accordance with which Quaker City wired and wrote to Jerpe of its advances and requested to be informed how Jerpe wished the transaction handled, whereupon Jerpe forwarded a check to Quaker City for $12,635, and requested copies of all transactions with Bennett & Layton relative to these turkeys, and non-negotiable warehouse receipts, which receipts were thereupon forwarded by Quaker City.

3. Through the May, 1940 transaction, Jerpe acquired actual knowledge that the said turkeys held by Quaker City and stored by Bennett & Layton were subject to a lien for advances made by Quaker City to Bennett & Layton.

4. On June 7, 1940, Bennett & Layton notified Quaker City by telegram that Car MP-3405, containing 396 boxes of turkeys, would reach Quaker City the next day, and to store the same for the account of Jerpe. A copy of this telegram was sent by Bennett & Layton to Jerpe. Said car arrived at Quaker City on June 8, 1940, consigned to "Bennett & Layton, c/o Quaker City Cold Storage Co."

5. On June 7, 1940, Jerpe—having received a copy of the telegram sent by Bennett & Layton to Quaker City—wrote to Quaker City advising of the receipt of Bennett & Layton's telegram, and promising and agreeing further, that as soon as it would be advised by Quaker City of the amount necessary to clear advances against this car, a check therefor would be forwarded by Jerpe, subject to the condition, however, that such advances would only be repaid after Quaker City's acknowledgment of the transfer of the said turkeys to Jerpe's account.

6. Jerpe's letter of June 7, 1940, was received by Quaker City on June 8, 1940.

7. In reliance upon Jerpe's promise and agreement to repay any advance made by Quaker City upon Car MP-3405, after Quaker City's acknowledgment of the transfer of said turkeys to Jerpe's account, and in compliance therewith, Quaker City, on June 8, 1940, issued non-negotiable receipts for said turkeys and forwarded same to Jerpe.

8. Each warehouse receipt is identical in form and reads as follows and identifies Car MP-3405:

"This is a memorandum for the depositor's convenience only, and is not to be used as a negotiable receipt.

The obligation to receive, store and/or deliver goods is conditioned upon and subject to service delays caused by direct or sympathetic strikes or other labor disputes, and accidents and unavoidable casualties in the operation of the Warehouse.

Railroad Sidings

Quaker City Cold Storage Company, Delaware Ave., Spruce & Water Sts., Philadelphia, Pa. 6/8/1940

Not Negotiable

has deposited, at sole risk of owner.

M Jerpe Commission Co.
said to contain
Eight (8) Boxes Turkeys
Orig Date
2/2/40
Marks 14/16
Young Toms

(Stamped)    FREEZER

Condition of Package

Quality unknown, Car No. MP-3405

All claims for Loss or Damage to be presented in writing at the Company's office within 10 days after delivery. To be delivered to depositor only. Rates of storage 1 Ct. per lb. per month.

The Company shall not be liable for any injury, loss or damage to said property caused by fire, water leakage, evaporation, or any cause not the result of the Company's negligence.

Bailee's Lien

All goods are received only upon condition that they are subject to a general lien, not only for the storage, freight, advances, or other charges thereon, but also for the balance of any other accounts due.

Grugan
Agent        Consecutive No. and Lot No. 62267."

9. Having ascertained that Bennett & Layton had drawn three drafts of varying amounts, only one of which was for $8,200 against a car numbered PFE 44012 and none of them against a car numbered MP-3405, which drafts were in the possession of the Corn Exchange National Bank, Philadelphia, Pa., Quaker City wrote Bennett & Layton on June 12, 1940, inquiring concerning the same, for the purpose of replying to Jerpe's inquiry as to the amount of the advance against Car MP-3405.

10. On June 13, 1940, Bennett & Layton advised Quaker City by telegram that it had an $8,200 draft against a car of turkeys which should have been received by Quaker City "several days ago", and inquired whether said car was received and the draft paid.

11. The $8,200 draft referred to by Bennett & Layton in its telegram of June 13, 1940, was specifically applicable to the car of turkeys which arrived on June 8, 1940, in Car MP-3405, since there was only one $8,200 draft at the Corn Exchange National Bank, and there was only one car of turkeys which had been received by Quaker

City "several days ago", to wit, Car MP-3405, no other car of turkeys having been received by Quaker City from Bennett & Layton during the month of June, 1940.

12. Having ascertained that the particular draft applicable to the car of turkeys received on June 8, 1940 in Car MP-3405 was the one in the amount of $8,200, Quaker City advised Bennett & Layton on June 14, 1940, that said draft would be paid on June 15, 1940.

13. On June 15, 1940 Quaker City paid the sum of $8,200 to the Corn Exchange National Bank in payment of the $8,200 draft against Car MP-3405.

14. On June 25, 1940, Bennett & Layton expressly advised Quaker City by telegram that the $8,200 draft paid by Quaker City on June 15, 1940, was against the car of turkeys which arrived on June 8, 1940, in Car MP-3405, containing 396 boxes of turkeys.

15. Quaker City offered to release Car MP-3405 to Jerpe upon repayment of the $8,200 advance made by Quaker City against the same, in accordance with Jerpe's agreement contained in its letter of June 7, 1940, but Jerpe refused to repay said advance.

16. The sum of $8,200 was advanced by Quaker City on the security of Car MP-3405, being the only car of turkeys received by Quaker City in June, 1940, which could have been the subject of an advance, the agreement between Bennett & Layton and Quaker City expressly providing for advances only after the arrival of the shipment and its inspection by Quaker City.

17. All parties fully understood at the time of the issuance of the warehouse receipts that Car MP-3405 was to be the subject of an advance by Quaker City.

18. At no time in June, 1940 was any car of turkeys bearing number PFE 44012 in existence. The reference in the invoice accompanying the $8,200 draft was actually to "Ex" Car PFE 44012, indicating only that the contents of the car had been or might be transferred from one freight car to another.

19. Prior shipments from Bennett & Layton arrived in different car numbers than those indicated in the invoices.

20. The difference in the number of boxes of turkeys appearing in the invoice, to wit, 391, as against 396 received in Car MP-3405, was of no moment, since such differences were the rule in prior shipments.

21. The term "Assorted Poultry" in the invoice accompanying the draft includes selected turkeys.

22. So far as Quaker City was concerned, the "Ex" car number, the number of boxes, and the description, appearing in the invoice accompanying the draft, were immaterial, since Quaker City made an advance on a car of turkeys then in its possession, and subject to inspection.

23. Jerpe absolutely, unconditionally and unequivocally promised and agreed to pay to Quaker City any advances made by it against Car MP-3405 upon the transfer of said turkeys to Jerpe's account.

24. In making said advance of $8,200 upon Car MP-3405, Quaker City relied upon Jerpe's promise.

25. There is no proof that Jerpe paid any value to Bennett & Layton for Car MP-3405.

26. It is uncontradicted that Quaker City paid $8,200 upon the security of said turkeys in Car MP-3405.

### Discussion.

In substance it is claimant Jerpe's contention that since the non-negotiable warehouse receipts were issued to it by Quaker City on June 8, 1940, and the "advance" of $8,200 was not made by Quaker City until June 15, 1940, and the warehouse receipts did not specifically set forth the amount of the "advance", Jerpe obtained title to the carload of turkeys free and clear of the lien of this "advance".

The defect in Jerpe's contention is that it ignores other essential facts in the situation.

From the transaction a week or two preceding the instant one, Jerpe knew that Quaker City was making loans (call them "advances" if you wish) against shipments by Bennett & Layton. On June 8, 1940, Quaker City received a letter dated June 7, 1940, from Jerpe which stated:

"As soon as you (Quaker City) advise us (Jerpe) the amount necessary to clear your advances advise us and we will see that check is mailed immediately. It is understood *this check will be mailed after acknowledgment and transfer to our account of these turkeys.*" (Emphasis supplied.)

There had been a confusion in the description on the $8,200 draft covering the car in question, and consequently Quaker City could not advise Jerpe of the amount necessary to clear the advance until the situation was clarified. When Quaker City finally assured itself of the identity of the draft it paid it on June 15, 1940, and advised Jerpe of the amount. Thus Quaker City fulfilled the two conditions of Jerpe's letter wherein Jerpe obligated itself to pay upon (1) advice of the amount necessary to clear the Quaker City advance and (2) the acknowledgment and transfer of the turkeys to Jerpe's account.

Jerpe contends that its June 7, 1940, letter from Omaha, Nebraska, could not have arrived in Philadelphia on June 8, 1940, notwithstanding the fact that its counsel had previously stipulated that fact (as it now asserts, in error). I would unhesitatingly agree with this contention and take judicial notice of the impossibility of a letter reaching Philadelphia in that space of time *in ordinary course of mail*. However, a communication from the Postmaster, which the parties have agreed to accept as evidence, indicated that a letter sent via air mail from Omaha could have arrived the following day in Philadelphia. We have the positive evidence from Lang, the witness for Quaker City, that he received the letter on June 8, 1940, and had sent off the warehouse receipts in reliance upon the letter. The information as to the manner of sending the letter was peculiarly in the hands of Jerpe, and although an opportunity was afforded it offered no testimony on that point. Thus we have the affirmative testimony of the recipient of the letter uncontradicted, coupled with its physical possibility. I have therefore made Finding 6 accordingly.

But even apart from the date on which Jerpe's letter was received by Quaker City, I am of the opinion—and have so found— that Jerpe knew that the car load in question was the subject of an advance by Quaker City when it, Jerpe, received the non-negotiable warehouse receipts. The mere fact that the precise amount (as yet unascertained) was not noted on the receipts does not therefore avail Jerpe. The definition of the term "advances" as appears on the warehouse receipts is not material as long as Jerpe knew that Quaker City contemplated a payment or loan on the carload and a reimbursement by Jerpe.

Jerpe cannot now say, "It is not so nominated in the bond". The previous transaction and the letter of June 7, 1940, indicate Jerpe's knowledge of Quaker City's intention. Jerpe was not misled (it has, indeed, offered no testimony that it suffered any loss or has changed its position). It is likewise clear that it was the intention of Jerpe to reimburse Quaker City.

The general principle is well stated in Section 505 of the Restatement of the Law of Contracts: "Except as stated in sections 506, 509-11 [which have no application here], if one party at the time of the execution of a written instrument knows not only that the writing does not accurately express the intention of the other party as to the terms to be embodied therein, but knows what that intention is, the latter can have the writing reformed so that it will express that intention."

From what I have said, it is scarcely necessary to answer the argument that Quaker City is estopped from asserting its lien because (as Jerpe claims) the warehouse receipt was in violation of Section 2 of the Uniform Warehouse Act (Penna. Act of March 11, 1909, P.L. 19, 6 Purd. Stat. § 132) in that it did not specify the amount of advances made. The section of the Act itself provides that:

"A warehouseman shall be liable, *to any person injured thereby*, for all damage caused by the omission *from a negotiable receipt* of any of the terms herein required." (Emphasis supplied.)

The receipts in question are *not* negotiable receipts, nor does it appear that the claimant was *injured* thereby.

I therefore state the following

### Conclusions of Law.

1. Jerpe having promised and agreed to repay the advance made by Quaker City against Car MP-3405, and Quaker City having been led thereby to make said advance and to act on the faith of Jerpe's promise, and the circumstances being such that injustice can be avoided only by the enforcement of Jerpe's promise, Jerpe is estopped from repudiating its obligation.

2. Jerpe is not a bona fide purchaser for value of the said turkeys; Quaker City, having made its advance in good faith, upon the security of the turkeys, has all the rights of such a purchaser to the extent of its advance.

3. Quaker City had a valid lien and claim against the car of turkeys received on June 8, 1940 in Car MP-3405 for the amount of its advance in the sum of $8,200.

4. Jerpe having refused to repay said advance, it has no valid claim against Quaker City either on the bond filed by Quaker City or otherwise.

5. The trustees' objections to the Jerpe claim have been established and the same should be, and are hereby, sustained.

6. The claim of Jerpe should be dismissed.

Accordingly, the exceptions to the special master's report are dismissed and, in accordance with the recommendation of the special master, the following order is made:

Order: And Now, to wit, February 27th, 1943, the objections filed in this proceeding to the claim of the Jerpe Commission Co., Inc., are sustained; the claim of the Jerpe Commission Co., Inc. is dismissed; and the outstanding refunding bond in the sum of $9,000 given by the Debtor in favor of that Company, is declared a nullity.